0460

Rossie N. REID, and Paul W. Reid, Respondents, v. HARBISON DEVELOP-MENT CORPORATION and Sam D. Coogler, Builder, Inc., Defendants, of whom Sam D. Coogler, Builder, Inc., is also a Respondent, Appeal of HARBISON DEVELOPMENT CORPORATION.

(330 S. E. (2d) 532)

Court of Appeals

*Robert F. Fuller,* of *Rogers, McDonald, McKenzie, Fuller & Rubin,* Columbia, *for appellant.*

*James S. Chandler, Jr.,* Columbia, *for respondents.*

Heard Dec. 17, 1984.

Decided May 6, 1985.

*Per Curiam:*

Respondents Paul and Rossie Reid sued appellant Harbison Development Corporation[1] for damages arising out of Harbison's alleged misrepresentation in the course of selling a residential lot. The jury awarded the Reids $20,000 actual damages and $20,000 punitive damages. Harbison appeals

---

[1] Defendant Sam Coogler, Builder, Inc. was involved in a bankruptcy proceeding at the time of the trial. Because of the automatic stay imposed by the federal Bankruptcy Act, this case proceeded to trial against Harbison alone.

the judgment entered on the verdict. We remand for a new trial solely on the issue of actual damages.

In early 1979, the Reids were in the market to purchase a new home and became acquainted with David Jordan, a real estate sales agent employed by Harbison. Jordan showed the Reids several lots in Harbison development, one of which was located on a dirt-filled stagnant pond. The Reids were interested in the lot but concerned about the ownership, development and maintenance of the pond. Jordan told them Harbison would develop, clean, stock, landscape, maintain and own the pond.

Since Harbison's policy was to sell lots to a builder or developer rather than the prospective homeowner, Jordan arranged a meeting between the Reids and Sam Coogler, a builder. On April 29, 1979, the Reids entered a contract with Coogler to purchase the lot from Coogler and to have him build a house on it.

About five weeks thereafter, Harbison deeded the lot to Coogler. The deed contained a restrictive covenant reserving Harbison's right and stating its intent to convey the pond to a homeowners' association composed of owners of lots on the pond. Further, the lot was conveyed subject to the requirement of mandatory membership in the association which would have authority to make assessments for maintenance and liability insurance coverage. The deed also provided that unpaid assessments would constitute a lien on the property in favor of the association. The deed was recorded on June 8, 1979.

On July 26, 1979, the day before the Reids' closing, Harbison and Coogler signed a "Declaration of Covenants, Restrictions and Charges," further subjecting the lot to the restrictions of a newly formed Woodpond Homeowners' Association. The declaration was recorded the day of the Reids' closing.

The Reids, Jordan, a Coogler employee, and Coogler's attorney attended the closing. The subject of the homeowners' association came up. The Reids testified this was the first time an association had been mentioned and when they hesitated in signing further closing papers, they were assured by those present that the association would be formed in the future, membership in it would be optional and they

could choose not to participate. Harbison disputed this testimony. Jordan testified that when he learned a week before the closing that Harbison intended to divest itself of ownership of the pond and to convey it to a homeowners' association, he immediately informed the Reids.

A year after purchasing the property, the Reids received a notice of a meeting of the Woodpond Homeowners' Association. Upon investigation, they learned membership in the association was mandatory and they were financially responsible for their share of the pond's upkeep.

The Reids commenced suit to recover damages on four theories: (1) common law fraud and deceit, (2) breach of contract accompanied by fraudulent acts, (3) breach of fiduciary duty, and (4) violation of the South Carolina Unfair Trade Practices Act. The trial court granted Harbison's motions for directed verdicts on the second and third causes of action. The case was submitted to the jury on two remaining causes and the jury found in favor of the Reids. Harbison moved for judgment notwithstanding the verdict or, in the alternative, a new trial absolute or new trial on the issue of damages. The court denied the motions.

On appeal Harbison contends the court erred in denying its motion for judgment n.o.v. or a new trial because (1) the Reids failed to prove they were ignorant of the falsity of Harbison's representation and that they had a right to rely on it, and (2) the jury's verdict is excessive and not supported by evidence.

In support of its first contention, Harbison argues the evidence shows the Reids had either actual knowledge or record notice of the falsity of Harbison's representation that it would own and maintain the pond. Harbison also argues the Reids had no right to rely on the representation because the recording acts imposed a duty on them to investigate the record to determine if their title was encumbered. We disagree.

Generally, as between the parties, the recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation. *Restatement (Second) of Torts* Section 540 (1979); *cf. Tallevast v. Herzog*, 225 S. C. 563, 83 S. E. (2d) 204

(1954) (normally, a buyer may rely upon a seller's representation that he can convey that which he offers for sale). The person committing the fraud cannot defeat a claim for misrepresentation simply because the person defrauded is charged with notice under a recording statute [*Brandt v. Olympic Construction, Inc.*, 16 Mass. App. 913, 449 N. E. (2d) 1231 (1983); *Heverly v. Kirkendall*, 257 Or. 232, 478 P. (2d) 381 (1970); *First National Bank in Lenox v. Brown*, 181 N. W. (2d) 178 (Iowa 1970); *Citizens Savings & Loan Association v. Fischer*, 67 Ill. App. (2d) 315, 214 N. E. (2d) 612 (1966); *Cowles, Ex'r v. Johnson*, 297 Ky. 454, 179 S. W. (2d) 674 (1944)], particularly where the misrepresented facts are peculiarly within the representor's knowledge. As stated in 37 C.J.S. *Fraud* Section 34c (1943):

> Where the fact misrepresented or the matters which are concealed are peculiarly within the representor's knowledge and the representee is ignorant thereof, it is generally held that, although the real fact appears on the public records, the representee is under no obligation to examine the records, and his failure to do so does not defeat his right of action. This is especially true where the very representations relied on induced the hearer to refrain an examination of the records, where the employment of an expert would have been required to deduce the truth from an examination of the records, where confidential relations existed, or where the defrauded party was inexperienced. In such cases the doctrine of constructive notice is inapplicable.
>
> The true test of the hearer's right to rely on misrepresentations as to matters of record is whether or not he acted with reasonable prudence in so doing.

*Accord, Fox v. Southern Appliances, Inc.*, 264 N. C. 267, 141 S. E. (2d) 522 (1965); 37 Am. Jur. (2d) *Fraud & Deceit* Section 263 (1968).

We note first that at the time the representations here relied on were made (representations which induced the Reids to enter into the contract with Harbison to purchase the property), no instruments had been recorded in the public records regarding the ownership, development and maintenance of the pond. Clearly, Harbison cannot claim that the Reids had constructive notice of the pond's

ownership at the time the sales contract was executed. Secondly, the Reids were laymen and would have required the assistance of an expert to ascertain from the public records the truth of Harbison's representation.

Third, in addition to the initial representation that induced the sales contract, the Reids also testified Harbison induced them to accept title to their home in spite of the documents of record by additional representations.

Based on these facts, we find evidence upon which the jury could reasonably have found that the Reids had no actual knowledge of Harbison's misrepresentations; that the facts misrepresented were peculiarly within Harbison's knowledge; that the representations made by Harbison at closing induced them to refrain from discovering the true facts; and that they acted with reasonable prudence in entering into the contract with Harbison and in accepting the deed. Because the jury inferentially found that the Reids acted reasonably, the law does not charge them with constructive notice in this instance. 37 Am. Jur. (2d) *Fraud and Deceit* Section 262 (1968). The trial court therefore properly denied Harbison's motion for judgment notwithstanding the verdict on the action for fraud.

Harbison next argues that the evidence fails to support the jury's award of $20,000 actual damages. In an action for damages for fraud and deceit, the measure of damages is the difference between the value the plaintiff would have received if the facts had been as represented and the value he actually received, together with any special and consequential loss which is the natural and proximate result of the fraud. *Lawson v. Citizens & Southern National Bank of South Carolina*, 255 S. C. 517, 180 S. E. (2d) 206 (1971); *Starkey v. Bell*, 281 S. C. 308, 315 S. E. (2d) 153 (Ct. App. 1984). We agree that the Reids' evidence of damages does not support the jury's award.

Most of the Reids' evidence on the value of their property related to present value rather than its value at the time of the misrepresentation, a period of two years. They introduced no evidence to support the jury's award of $20,000 actual damages. In fact, Mrs. Reid testified to the following:

Q. Do you feel like the restrictions have devalued your home in any way?

A. Absolutely....

Q. Do you have any opinion as to the difference of value of your home with these restrictions on it as opposed to the understanding you had when you signed the contract? ...

A. It is my opinion that we would lose several thousand dollars, $4,000 to $5,000 at least on the property.

Counsel for the Reids also argues that the amount of damages should include the cost of bringing the pond, which was in a run-down condition, up to proper engineering standards. We disagree. If a defrauded person elects to affirm the contract and sue for damages to the property, he may collect the difference between the actual value and the value as represented, but may not also collect the cost of bringing the property up to proper standards. Evidence of the reasonable cost of correcting the defect, however, may be an essential part of the proof of damages. *Orkin Exterminating Co., Inc. v. Bryan,* 163 Ga. App. 804, 294 S. E. (2d) 683 (1982); McCormick, *Law of Damages,* p. 456 (1935).

Similarly, Harbison asserts that the award of punitive damages is grossly excessive and based on prejudice, passion and caprice. Harbison also argues that the evidence contains no indication of its ability to pay. Thus the award has no objective foundation and is erroneous as a matter of law.

We first address the question of excessiveness of the verdict. Our appellate courts have recognized that the chief considerations in assessing punitive damages are the character of the tort committed, the punishment which should be meted out and the ability of the wrongdoer to pay. *Hicks v. Herring,* 246 S. C. 429, 144 S. E. (2d) 151 (1965); *Mylin v. Allen-White Pontiac, Inc.,* 281 S. C. 174, 314 S. E. (2d) 354 (S. C. App. 1984). It is well settled that an appellate court has little to do with the amount of verdicts and the granting of a judgment n.o.v. or a new trial on the basis of excessiveness is in the discretion of the trial judge whose decision will not be disturbed unless abuse of discretion is shown. *Fennell v. Littlejohn,* 240 S. C. 189, 125 S. E. (2d) 408 (1962). We have carefully evaluated the relevant evidence and although the amount of punitive damages is perhaps more than this Court would have awarded, we dis-

cern no matter in the record that would have induced the jury to act out of passion, caprice or prejudice.

Likewise, while arguably the jury that awards the Reids actual damages should consider the punitive damages also, we find no cases requiring that course. To the contrary, several cases permit a retrial of actual damages alone under the circumstances of this case, leaving undisturbed the punitive damages award especially where, as here, it is evident that the Reids are entitled to more than nominal damages. *Devine v. Patteson*, 242 F. (2d) 828, 832 (6th Cir. 1957), *cert. denied*, 355 U. S. 821, 78 S. Ct. 27, 2 L.Ed.(2d) 36 (1957); *Grimm v. Leinhart*, 705 F. (2d) 179 (6th Cir. 1983); (it would be unfair to force the plaintiff to reargue her entire claim before a second jury); *see generally Industrial Welding Supplies, Inc. v. Atlas Vending Co.*, 276 S. C. 196, 277 S. E. (2d) 885 (1981). We therefore see no reason to remand the jury's award of punitive damages.

Harbison finally contends that the court erred in submitting to the jury the cause of action based on the South Carolina Unfair Trade Practices Act [S. C. Code Ann. Section 39-5-10 (1976) *et seq.*] because the transaction was not affected with a public interest as is required by the South Carolina Act and the Federal Trade Commission Act [Section 5, 15 U.S.C. Section 45 (1975)]. We need not address this contention. Under the two issue rule, this Court will not reverse a general jury verdict which is supported by evidence on at least one issue. *Anderson v. West*, 270 S. C. 184, 189, 241 S. E. (2d) 551 (1978). As previously stated, the evidence sustains an award of damages on the issue of fraud.

We have considered the additional assignments of error alleged by Harbison. Assuming for the sake of argument that there is merit in them, we nevertheless dismiss them because Harbison has shown no prejudice resulting from the errors alleged.

For the reasons stated, we remand the case for a new trial solely on the issue of actual damages.

Affirmed in part and remanded in part.